UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTEVA PRODUCTS, LLC.
        Plaintiff,

vs.

CANADIAN GENERAL TOWER LTD;
and
CANADIAN GENERAL TOWER US LTD,
        Defendants,

Case Number 21-cv-12632
Honorable

/

## VERIFIED COMPLAINT FOR BREACH OF CONTRACT, INJUNCTIVE AND OTHER RELIEF

Plaintiff Inteva Products, LLC ("Inteva") complains against defendants Canadian General Tower Ltd.; and Canadian General Tower US Ltd. (collectively "CGT") as follows:

### SUMMARY OF ACTION

1. Inteva is a tier 1 automotive supplier that purchases specialized PVC coated fabrics from CGT that Inteva uses to manufacture components for automotive interiors for General Motors LLC and its applicable affiliates (collectively, "GM"). CGT provides the Products under fixed-price requirements contracts that are valid through December 31, 2030.

2. Despite acknowledging that there has been no amendment permitting a price increase with respect to such agreements, CGT nonetheless stopped shipment

of its products to Inteva and a key supplier to Inteva because Inteva did not implement price increases of 11% to 17% on the products.

3. Inteva purchases CGT's products for use in the upcoming versions of the highly popular GM full-size truck/large SUV program (the "T1 Program"), launching on or before February 2022 ("start of production" or "SOP"). The ramp up to start of production is a very delicate phase, that is critically important for a successful program launch. It is phase during which testing and approvals are finalized, production processes are perfected and necessary coordination among the entire supply base takes place.

4. CGT's refusal to supply products will not only delay but will also jeopardize the successful start of production for the T1 Program. Given the six-week lead time required for CGT to acquire raw materials needed to make its products, CGT's continued performance immediately is crucial.

5. Inteva seeks a temporary, preliminary and permanent injunctions requiring CGT to comply with its contractual obligations. CGT agreed that such relief would be appropriate if it threatened to halt delivery of its products. Additionally, temporary and preliminary injunctive relief is warranted here. Inteva will certainly prevail on the merits of its claims, Inteva will suffer irreparable injury if CGT does not perform as promised, the harm CGT has threatened eclipses the

harm CGT would suffer under the injunction Inteva seeks, and the public interest favors issuance of the injunction Inteva seeks.

## PARTIES, JURISDICTION AND VENUE

6. Inteva is a Delaware limited liability company with its headquarters at 1401 Crooks Road, Troy, MI 48084. Its sole member is The Renco Group, Inc., a New York corporation with its principal place of business in New York. For purposes of diversity jurisdiction, Inteva is a citizen of New York.

7. Canadian General Tower Ltd. is an entity formed under Canadian law with its principal place of business in Canada. Thus, for purposes of diversity jurisdiction, it is considered a citizen of a foreign nation.

8. Canadian General Tower US Ltd., is a Texas corporation. Its principal place of business is located in Canada, at 52 Middleton Street (PO Box 160), Cambridge, Ontario N1R 5T6. Thus, for purposes of diversity jurisdiction, it is a citizen of Texas and of a foreign nation. (Note, it has a facility at 695 Holcan Drive, New Braunfels, Texas 78130, which does not alter the citizenship analysis.)

9. The amount in controversy exceeds $600,000, exclusive of interest and costs.

10. This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1332. There is complete diversity between the parties because this dispute is between a plaintiff that is a citizen of New York and two defendants, one

a citizen of a foreign country and the other a citizen of Texas and a foreign country. Also, the amount in controversy exceeds $75,000.

11. This Court has personal jurisdiction over the defendants because they specifically consented to the personal jurisdiction of this Court in the contract at issue and, upon information and belief, they conduct business within the state of Michigan.

12. Venue is also proper before this Court under 28 U.S.C. § 1391(b)(3) because defendants are subject to this Court's personal jurisdiction.

13. This matter is otherwise within this Court's jurisdiction.

## BACKGROUND

14. Inteva is a global supplier of engineered components and systems for the automotive industry, including closure systems, interior systems, and motors and electronics. Its customers include all the major original equipment manufacturers of automobiles (OEMs).

15. CGT was formed in 1869 and has become an international supplier of coated fabrics and films used in automotive, medical and building products. In the automotive field, CGT is one of the world's leading producers of polymeric coated fabrics and films.

16. Canadian General Tower US Ltd. is a mere alter ego of Canadian General Tower Ltd, which controls its affairs, negotiates its contracts and provides

personnel to act on its behalf, without distinguishing between the two nominally distinct entities.

17. Inteva purchases PVC-based rolled goods (the "Products") from CGT, which Inteva uses to produce parts that will be incorporated into automotive interiors components used in doors for GM's T1 program.

18. Additionally, Inteva's supplier HFI, LLC ("HFI") purchases the same Products from CGT using Inteva's negotiated pricing, which HFI uses in parts it supplies to Inteva that will also be used in GM's T1 program.

19. The T1 program, which is scheduled to begin full-scale production in February 2022, is the successor to GM's highly successful line of popular full-size trucks and large SUVs that include the Chevrolet Suburban or Silverado and the GMC Sierra and Yukon. This is one of the best-selling platforms of such vehicles ever.

20. GM and its T1 suppliers are currently in the critical stages of the ramp-up to the T1 program's start-of-production ("SOP"). For reasons discussed below, interruptions of supply at this point threaten the successful launch of the new T1 program and are arguably more consequential than interruptions once full-scale production is under way (which are catastrophic in their own right).

Bodman_18094545_5

21. CGT supplies the Products from its New Braunfels, Texas facility to Inteva's Brownsville, Texas facility. From Brownsville, Inteva transfers CGT's Products to several Inteva plants, as follows:

    a. Inteva's Matamoros, Mexico facilities, which process the Products;

    b. Inteva's Alianza (Matamoros), Mexico plant receives CGT Products from the Matamoros plants for Alianza's processing;

    c. Inteva's Guanajuato facility receives Products for processing and incorporation into door interior components for the T1 program; and

    d. All three of these plants, directly or indirectly, transfer materials to Inteva's Bluffton, Indiana plant for final door assembly for the T1 program.

22. Additionally, Inteva's supplier HFI receives CGT's Products, which it purchases using CGT's pricing and performs cut, sew and wrap operations on the Products before transferring them to Inteva for further processing.

23. Inteva's contract with CGT for its supply of the Products is set forth in two Inteva-issued purchase orders: Blanket Purchase Order UGU000770 (Exhibit

A, issued March 19, 2021) and Blanket Purchase Order UM3000015 (Exhibit B, issued January 21, 2021) (collectively, the "Purchase Orders").[1]

24. CGT supplies Products to HFI to support its production under the following Inteva purchase orders to HFI (gathered at Exhibit C):

    a. Blanket Purchase Order BLF000075, for goods supplied to Inteva's Bluffton, Indiana plant; and

    b. Blanket Purchase Order UGU000731, for goods supplied to Inteva's Guanajuato, Mexico plant.

25. The Purchase Orders expressly incorporate by reference Inteva's General Terms and Conditions ("Inteva Terms," Exhibit D) and the Inteva Supplier Requirements Manual ("Inteva Manual," Exhibit E).

26. The Purchase Orders are requirements contracts (Inteva Terms, §3) and they are valid through December 31, 2030 (Exhibits A and B).

27. The Inteva Manual expressly provides that CGT is responsible for managing its own supply chain to deliver an uninterrupted flow of the Products to Inteva's manufacturing locations. (Manual, §5.2)

---

[1] Pricing has been redacted from the Exhibits to this Complaint because it is confidential business information. Defendants have unredacted copies of the exhibits and Plaintiff can deliver unredacted copies to the Court upon request.

28. CGT agreed to the Purchase Orders when it began performance under them without objecting to their terms in writing within ten (10) days and by accepting and shipping to Inteva's releases. (See Inteva Terms, §1.)

### CGT PRICE INCREASE DEMAND AND REPUDIATION

29. Prior to issuing the Purchase Orders, Inteva's purchasing department informed CGT that the Purchase Orders would be fixed price contracts.

30. Section 5 of the Inteva Terms specifically provides: "Supplier will deliver Products and Services in strict accordance with the Contract terms."

31. There is no provision in the Purchase Orders or the Inteva Terms permitting CGT to increase the price during the term unless Inteva has made a change to the "drawings, specifications, materials, packaging, time or method of delivery or shipment, or similar requirements." Inteva has not made any such changes.

32. Nevertheless, on April 14, 2021 CGT announced that it would increase its prices globally between 5% and 7%, effective June 1, 2021. (See Exhibit F, Sean O'Sullivan 4-14-2021 email and attachment).

33. Inteva denied CGT's request in writing on July 1 and 14, 2021

34. Then, on July 20, 2021, CGT's Sean O'Sullivan informed Inteva that CGT demanded an 11% price increase on the Products, retroactive to July 1, 2021. (See Exhibit G, Sean O'Sullivan 7-20-2021 email).

35. On August 9, 2021, Inteva's Jessica Nowakowski wrote CGT declining to implement the price increases CGT demanded and reminding CGT of its contractual obligations under the Purchase Orders.

36. On October 1, 2021, CGT's Joel Donlon gave Inteva supplier HFI that CGT would impose the same price increases on the Products it supplied to HFI, for Inteva's ultimate receipt. CGT imposed an October 11, 2021 deadline for implementation of the price increases, and when Inteva and HFI refused to implement them, CGT confirmed that it had stopped shipments to HFI. (See Exhibit H, CGT-HFI email correspondence dated October 1 to 12, 2021.)

37. On November 5, 2021, CGT's Douglas Holder, Vice President of Automotive Sales, wrote Inteva's Senior Buyer Jessica Nowakowski. In his letter, Mr. Holder recognized that the Purchase Orders and Inteva Terms govern the parties' agreement and that there was no written amendment of the Purchase Orders implementing a price increase.

38. Despite this, Mr. Holder demanded that Inteva assure CGT by Monday, November 8, 2021 (the next business day) that Inteva would implement the price increases (which then ranged from 11% to 17%). If it did not, Mr. Holder said, "CGT will have no choice but to act on its repeated statement that it will neither produce nor ship product until Inteva approves the price increase."

39. In fact, CGT has stopped shipment of the Products to Inteva and HFI.

40. CGT has a six-week lead-time for receipt of the raw materials it needs to make the Products. Thus, if CGT does not have an adequate supply of the raw materials on hand, it will interrupt production for at least six weeks.

## CONSEQUENCES OF CGT'S REFUSAL TO SHIP

41. The ramp-up to SOP is a critical stage of the automotive design-to-production cycle. It is the phase in which all testing, PPAP (Production Part Approval Process) and other approvals are finalized, production processes are perfected, supplier workforces are trained, product shipping and logistics are optimized and any other obstacles to a successful SOP are resolved.

42. Interruption of the final phases before SOP is arguably more catastrophic than interrupting full-scale production because any challenges at this stage threaten the prospects for a successful product launch and disproportionately delay actual production.

43. Without continued supply from CGT, Inteva Guanajuato will be unable to continue producing as November 30, 2021; Inteva Matamoros will cease producing November 22, 2021 and HFI will stop by November 25, 2021.

44. Given the six-week lead-time for ordering raw materials as represented by CGT to Inteva, these production interruptions are inevitable if CGT does not have a sufficient supply of on hand.

45. Moreover, it is not simply the Inteva production operations at these plants that will shut down. Employee training, PPAP trials and finalization, and supply chain product flow (logistics) optimization will also halt.

46. This disruption will also impact GM as well as other suppliers trying to support the T1 program.

47. CGT is Inteva's sole source for the Products (and HFI's sole source). It cannot obtain adequate, approved replacements in time to avoid these damages and disruption.

48. CGT's timely delivery of parts is a material obligation under the parties' agreements. The Inteva Terms specifically provide: "Supplier will deliver Products and Services in strict accordance with the Contract terms. Time is of the essence with respect to all delivery schedules Purchaser establishes." (Inteva Terms, §5).

49. Under the Purchase Orders, CGT specifically agreed:

> Supplier acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of the Contract by Supplier with respect to its delivery of Products to Purchaser and that, in addition to all other rights and remedies which Purchaser may have, Purchaser shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. (Inteva Terms, §35).

50. Because the financial losses that would result from CGT's threatened refusal to produce and ship the Products would be incalculable, Inteva has no

adequate remedy at law. As CGT agreed under the Purchase Orders, Inteva is entitled to injunctive relief compelling CGT to manufacture and deliver the Products.

## COUNT I
## INJUNCTIVE RELIEF

51. Inteva incorporates paragraphs 1 through 50 of its complaint as if set forth here fully.

52. CGT has acknowledged in writing that the Purchase Orders are valid, binding contracts that include the Inteva Terms. It has further acknowledged that a written amendment of the Purchase Orders is necessary to implement the price increase CGT has demanded but there has been no such amendment.

53. CGT's threat to cease producing and delivering the Products would cause incalculable financial losses, including the loss of customer goodwill and disruption of the SOP for GM's T1 program and all the suppliers supporting it.

54. Inteva, therefore, has no adequate remedy at law for the consequences that would ensue if CGT carries out its threat.

55. Under the Purchase Orders, CGT agreed that Inteva would be entitled to injunctive relief to avoid such consequences. (Inteva Terms, §35).

56. Inteva is entitled to temporary, preliminary and permanent injunctive relief. In addition to CGT's agreement to the issuance of such relief:

    a. Inteva is likely to succeed on the merits of its claim that CGT has repudiated that Purchase Orders and that its threatened refusal to

      produce and deliver the Products is a material breach of the Purchase Orders;

b. Inteva is likely to suffer irreparable injury in the form of incalculable financial losses, the loss of customer goodwill and disruption of the automotive supply chain of which it is a key supplier;

c. The harm Inteva would suffer without injunctive relief greatly outweighs the harm that issuance of such an injunction would cause to CGT, which would merely be compelled to perform the Purchase Orders, to which it freely agreed.

d. The public interest greatly favors issuance of injunctive relief, in order to avoid the supply chain disruption that would affect many other suppliers and their employees and to enforce contractual obligations.

57. Temporary and preliminary injunctive relief is necessary to preserve the status quo pending a trial on the merits of Inteva's claim.

WHEREFORE, Inteva requests that the Court issue temporary, preliminary and permanent injunctions requiring CGT to continue performing its obligations under the Purchase Orders, including the production and delivery of the Products to Inteva and HFI. Inteva also seeks an award of any damages it suffers because of

Bodman_18094545_5

CGT's repudiation, as well as reasonable attorneys' fees and costs in this action.

## COUNT II
## BREACH OF CONTRACT

58. Inteva incorporates paragraphs 1 through 57 of its complaint as if set forth here fully.

59. As CGT has acknowledged, the Purchase Orders are valid agreements between Inteva and CGT, binding on CGT.

60. CGT's repudiation of the Purchase Orders as described above and its threatened refusal to produce and deliver the Products are material breaches of the Purchase Orders.

61. CGT's repudiation and threatened refusal will proximately cause substantial damages to Inteva. The damages would be incalculable, however to the extent they are calculable, Inteva is entitled to recover such damages from CGT on account of its breach of the Purchase Orders.

62. In addition, CGT agreed that it is liable for the financial losses Inteva would suffer due to CGT's breach. Section 27 of the General Terms, specifically provides that Inteva may recover any "direct and indirect losses, costs and damages resulting from Supplier's failure to timely deliver Products or Services," among other recoverable losses or costs.

63. Also, under the Inteva Manual, if Inteva's and/or its customer's production is delayed or interrupted by CGT's failure to deliver contracted goods within the terms of the contract, all costs that are incurred by Inteva and/or its customers will be CGT's sole responsibility. (Manual, §4.7)

WHEREFORE, Inteva requests that the Court enter a judgment in favor of Inteva and against CGT for the amounts by which Inteva is damaged due to CGT's breach of the Purchase Orders, together with plus interest, reasonable attorneys' fees and costs in this action.

                                      Respectfully submitted,

                                      BODMAN PLC

                                      By:/s/Jeffrey G. Raphelson
                                          Jeffrey G. Raphelson (P38036)
                                          Jane Derse Quasarano (P45514)
                                          6th Floor at Ford Field
                                          1901 St. Antoine Street
                                          Detroit, Michigan 48226
                                          (313) 259-7777
November 9, 2021                       Attorneys Inteva Products, LLC

## VERIFICATION

Jessica Nowakowski, under penalty of perjury, declares that:

I am employed by Inteva Products, LLC as a Senior Buyer. I have examined the records of Inteva Products, LLC with respect to its requirements contract with CGT and based on that review and my personal knowledge verify the facts contained in this Verified Complaint.

By: _____
      Jessica Nowakowski,

November 8, 2021          Senior Buyer, Inteva Products, LLC